### UNITED STATES v. FIRST NAT. BANK OF YAKIMA, WASH., et al.

(District Court, E. D. Washington, S. D.   June 30, 1922.)

No. 932.

**Indians ☜15(1)—Mortgage of crops by allottee held void.**
> Under Allotment Act Feb. 8, 1887, § 5 (Comp. St. § 4201), providing that allotments of lands made thereunder shall be held in trust "for the sole use and benefit" of the allottee, and further providing that "any contract made touching the same" before expiration of the trust period "shall be absolutely null and. void," the protection extends to the use of the land, and a mortgage by an allottee of growing crops thereon is void.

In Equity. Suit by the United States against the First National Bank of Yakima, Wash., and another. Decree for complainant.

Frank R. Jeffrey, U. S. Atty., and H. Sylvester Garvin, Asst. U. S. Atty., both of Spokane, Wash.
Richards, Fontaine & Gilbert, of Yakima, Wash., for defendants.

RUDKIN, District Judge. On the 11th day of May, 1921, John Smith, an Indian allottee on the Yakima Indian Reservation, executed a mortgage on the crops of wheat and alfalfa then growing, or to be grown during the year 1921, on certain Indian allotments held in trust by the United States for the use and benefit of the allottees, or their heirs, under the General Allotment Act of February 8, 1887 (24 Stat. 388 [Comp. St. § 4195 et seq.]). The mortgage was executed and delivered to one Nelson to secure the payment of a promissory note in the sum of $2,115, the purchase price of an automobile. Thereafter the note and mortgage became the property of the defendant bank, and the bank foreclosed the mortgage in one of the courts of the state in an action to which the United States was not a party. The present suit was thereupon instituted by the United States against the bank and the sheriff of Yakima county to enjoin the sale of the mortgaged crops under the execution or order of sale issued out of the state court. Upon the filing of the complaint a temporary injunction was granted, and the case is now before the court for final decree on motion to dismiss, there being no dispute over the facts.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The sole question presented by the record is the validity of the mortgage in question and the right to sell on foreclosure as against the United States. The only case called to my attention bearing upon that question is Rider v. La Clair, 77 Wash. 488, 138 Pac. 3. In discussing the validity of such a mortgage the court there said:

"We have no hesitation in holding that the affirmative acts of Congress with reference to certain kinds of personal property, coupled with the later policy of the government to encourage agricultural pursuits among the Indians and to encourage independence rather than dependence, are sufficient to clearly manifest the purpose of Congress to grant to the Indians a limited power to contract unless restrained by some departmental regulation. This being so, we hold the crop mortgages to be valid liens. Whether the mortgagees can enter before severance, or enter to foreclose, is a question we cannot answer upon the record before us. It may be that the government, in aid of its avowed policy to protect the Indian from the 'greed and avarice' of the white man, could prevent an entry by departmental order. The question is hardly before us, and we prefer to reserve it."

I cannot readily conceive of a valid lien without a remedy for its enforcement. It would seem that the validity of a lien and the right of foreclosure are inseparable. However, the court in that case did not undertake to decide the question now before me, and the intimation by the court that the foreclosure could only be prevented by departmental order or regulation is, in my opinion, unfounded.

Section 5 of the Allotment Act (Comp. St. § 4201) provides:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void."

In discussing the relationship of the United States to the Indians and their property, in United States v. Gray, 201 Fed. 291, 293, 119 C. C. A. 529, 531, the court said:

"It has been and still is the policy of the United States to protect the property and the rights of the Indians under its control, and to teach them agriculture and the arts of civilized life. The Indian reservations, the funds derived from the lease of their right of occupancy to their lands, the lands allotted to the individual Indians, but still held in trust by the United States during the period of restriction upon alienation, the leases of these lands made by the Indian superintendents or agents on the terms and conditions fixed by the Secretary of the Interior and approved by him, the tools, animals, houses, improvements, and other property furnished to these Indians by the United States, and the proceeds and income from all these, are the means by which the nation pursues its beneficent policy of protection and instruction and exercises its lawful powers of government. If one threatens or proceeds to destroy

these means, may not the United States resort to its own courts to prevent such destruction, or to recover the damages caused thereby?"

The crops growing upon an Indian allotment are a part of the land and are held in trust by the government the same as the allotment itself, at least until the crops are severed from the land. The use and occupancy of these lands by the Indians, together with the crops grown thereon, are a part of the means which the government has employed to carry out its policy of protection, and I am satisfied that a mortgage of any of these means by the Indian, without the consent of the government, is necessarily null and void. If the lien is valid, it carries with it all the incidents of a valid lien, including the right to appoint a receiver to take charge of and garner the crops, if necessary, and the right to send an officer upon the allotment armed with process to seize and sell the crops without the consent and even over the protest of the government and its agents. That this cannot be done does not, in my opinion, admit of question.

The temporary injunction is therefore made permanent, and a decree will be entered accordingly.